IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 04-cv-02512-MSK-BNB

COLORADO CHRISTIAN UNIVERSITY,

       Plaintiff,

v.

RAYMOND T. BAKER, in his official capacity as Chair of the Colorado Commission on Higher
Education,
DEAN L. QUAMME, in his official capacity as Vice Chair of the Colorado Commission on
Higher Education,
JUDY P. WEAVER, in her official capacity as Chair of the Colorado Commission on Higher
Education,
RICHARD GARCIA,
GREG C. STEVINSON,
JAMES M. STEWART,
RICK RAMIREZ,
EDWARD ROBINSON, all in their official capacity as a member of the Colorado Commission on
Higher Education, and
DAVID SKAGGS, in his official capacities as Executive Director of the Colorado Commission on
Higher Education and of the Colorado Department of Higher Education,

       Defendants.
_____

## OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
_____

    **THIS MATTER** comes before the Court pursuant to the Defendants' Motion for

Summary Judgment **(# 62)**, and the Plaintiff's response **(# 75)**; and the Plaintiff's Motion for

Summary Judgment **(# 72)**,[1] and the Defendants' response **(# 74)**.[2]  The Court has also considered

the *amicus* brief **(# 63)** filed by the United States.

## FACTS

The parties have stipulated **(# 61)** to the relevant facts, which are set forth in summary

fashion below, and are discussed in detail where pertinent to the analysis.

Tuition assistance programs and the "pervasively sectarian" exclusion

The State of Colorado offers various tuition assistance programs[3] to low-income students

attending colleges and universities in the state. ¶ 4.  Generally speaking, every accredited public or

private college operating in Colorado is eligible to participate, thereby allowing their students to

have access to the tuition assistance offered under the programs.  ¶ 7.  However, the Colorado

Constitution expressly prohibits the use of public funds for religious education. Colo. Const. Art.

IX, § 7.  Thus, by statute, any institution that is "pervasively sectarian" or "theological" is

---

[1]Although not expressly stated in the minutes of the September 20, 2006 hearing **(# 71)**, the Plaintiff's prior Motion for Summary Judgment **(# 64)** was denied by the Court as improperly formatted.  The minutes of the September 20, 2006 hearing are deemed amended to reflect this fact.

[2]The Defendants have moved for leave to submit supplemental authority **(# 76)**.  That motion is granted, and the Court has considered the authority cited therein.

[3]Several tuition assistance programs are at issue here: the Colorado Leveraging Education Assistance Partnership Program, C.R.S. § 23-3.5-101 *et seq.*; the Supplemental Leveraging Educational Assistance Partnership Program, C.R.S. § 23-3.7.101 *et seq.*; Colorado Student Grants, C.R.S. § 23-3.3-501, and Colorado Work Study, C.R.S. § 23-3.3-401. ¶ 4.  As relevant here, the standards by which an educational institution is eligible to receive funds under any of these programs are effectively the same.  The College Opportunity Fund, C.R.S. § 23-18-102(5)(a), is subject to different eligibility criteria, ¶ 9-12, but the differences among the programs do not affect the analysis herein.  Accordingly, the Court will refer to all of the various financial aid programs collectively throughout this opinion.  (References to "¶ _" refer to the cited paragraph of the parties' stipulation of facts **(# 61)**.)

2

excluded from participating the in these tuition assistance programs. ¶ 7; *see e.g.* C.R.S. § 23-3.3-101(3)(d).[4]  It is this statutory exclusion (hereinafter referred to as "the 'pervasively sectarian' exclusion") that CCU challenges in this action.

CCU's application

Plaintiff Colorado Christian University ("CCU") offers residential undergraduate and graduate programs at various locations in Colorado.  ¶ 15.  Beginning September 30, 2003, CCU submitted applications to the Colorado Commission on Higher Education ("the Commission"), seeking authorization to participate in the financial aid programs discussed above.  ¶ 46.  In May 2004, after conducting a preliminary examination of CCU's application and supporting materials, the Commission notified CCU that it did not meet the first (faculty and student body not exclusively of one religious persuasion), second (no required attendance at religious services), fourth (no required courses in theology), and fifth (governing board not limited to particular religion) elements of the "pervasively sectarian" test.  ¶ 53, 57.  Over the next several months, CCU supplemented its applications with additional information, and the parties continued to discuss whether the "pervasively sectarian" exclusion applied to CCU.  In early November 2004, the Commission formally advised CCU of its conclusion that CCU was "pervasively sectarian" and thus prohibited from participating in the financial aid programs.  ¶ 65-67.

---

[4]The term "pervasively sectarian" is statutorily defined in C.R.S. § 23-3.5.105.  That definition is supplied in the negative: an institution is <u>not</u> "pervasively sectarian" if it meets six criteria: (i) the faculty and students are not exclusively of one religious persuasion; (ii) there is no required attendance at religious convocations or services; (iii) there is a strong commitment to principles of academic freedom; (iv) there are no required courses in religion or theology that tend to indoctrinate or proselytize; (v) the governing board does not reflect, nor is the membership limited to, persons of any particular religion; and (vi) funds do not come primarily from sources advocating a particular religion.  ¶ 12.

Claims at issue in this action

CCU then commenced this action.  In its Amended Complaint (**# 8**), CCU asserts three claims, all pursuant to 42 U.S.C. § 1983: (i) that the "'pervasively sectarian' test," both facially and as applied, violates CCU's Free Exercise rights under the First Amendment to the United States Constitution; (ii) that the test, both facially and as applied, violates the Establishment Clause of the First Amendment; and (iii) that the test, both facially and as applied, violates the Equal Protection clause of the Fourteenth Amendment to the United States Constitution.

Both parties have filed motions for summary judgment (**# 62, 72**) pursuant to stipulated facts.

## STANDARD OF REVIEW

Fed. R. Civ. P. 56(c) provides for the entry of summary judgment if the parties' evidentiary materials "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Because the parties have stipulated as to all of the material facts, the only question is which party is entitled to judgment as a matter of law based upon those undisputed facts.

## ANALYSIS

Before turning to the particular claims in the Complaint, it is important to note what is not at issue.  The Commission concluded that, under the six-factor statutory test, CCU is a "pervasively sectarian" institution, and the correctness of that finding is not challenged by CCU. Neither CCU's Amended Complaint nor Motion for Summary Judgment contend that the Commission's decision was arbitrary and capricious, nor does CCU clearly seek appellate-type review of the Commission's findings of fact or application of the six statutory factors to those

4

facts.[5]   Absent a challenge to the correctness of the Commission's determination, the Court must

assume that the Commission properly applied and analyzed the statutory factors.[6]   Accordingly,

the Court accepts as fact that CCU is a "pervasively sectarian" institution.  The sole question

presented by CCU's Amended Complaint is whether the exclusion of "pervasively sectarian"

institutions from the tuition assistance programs violates the Free Exercise, Establishment, and

Equal Protection Clauses of the U.S. Constitution.

### A.  Free Exercise claims

#### 1.  Facial vs. as-applied challenge

CCU asserts both facial and as-applied challenges to the "pervasively sectarian" exclusion

under the Free Exercise clause.[7]   Because neither side clearly defines the parameters and the

precise analytical distinctions between the types of claims, the Court first takes a moment to

clarify the difference between a facial and an as-applied challenge in this context.

---

[5] In its initial Complaint **(# 1)**, CCU included a claim under C.R.S. § 24-4-106, alleging that the Commission's determination was arbitrary and capricious or based on erroneous factual findings.  However, CCU deleted this claim from its Amended Complaint **(# 8)**, warranting an inference that CCU purposefully abandoned this contention.

[6] As part of its argument, CCU contends that the Commission's assessment was "rigged," *Docket* # 72 at 40, and that the Commission's findings were erroneous. *See id.* at 37-39. However, because CCU's Amended Complaint does not assert a claim challenging the correctness of the Commission's determination and its motion does not clearly articulate a challenge to the determination on those grounds, the Court will consider these arguments only to the extent they are germane to the as-applied Free Exercise challenge, as these arguments are raised in that section of CCU's motion.

[7] CCU offers distinct arguments as to each type of challenge only with regard to the Free Exercise clause; as to the Establishment and Equal Protection Clause claims, CCU's point headings suggest that both types of challenges are asserted, but the corresponding arguments fail to differentiate between the two types of challenges.

A facial challenge in a First Amendment context asserts that a statute <u>always</u> operates unconstitutionally.  *Black's Law Dictionary*, 17th ed. at 223.  A facial challenge is, in essence, an assertion of the rights of all persons who may be adversely affected by the statute in question, rather than just the rights of the plaintiff.  *City of Chicago v. Morales*, 527 U.S. 41, 55 n. 22 (1999).  As such, it is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *U.S. v. Salerno*, 481 U.S. 739, 745 (1987) (in dicta).  In contrast, an as-applied challenge does not address all circumstances in which a statute might operate, but instead contends that statute has been applied unconstitutionally to the particular party asserting the challenge.  *Black's*, *supra.* at 223.

Facial challenges generally take one of two forms: vagueness and overbreadth.  *See Morales*, 527 U.S. at 52.  Vagueness challenges assert that the statute fails to establish clear standards for its application, exposing the public to arbitrary deprivation of constitutional rights. *Id.*  Overbreadth challenges are unique to First Amendment[8] jurisprudence: they arise in circumstances where impermissible applications of the law are substantial relative to the statute's otherwise plainly legitimate sweep.  *Morales*, 527 U.S. at 52, *citing Broadrick v. Oklahoma*, 413 U.S. 601, 612-15 (1973).  The fundamental characteristics of a facial overbreadth challenge are that it is anticipatory and derivative.  In other words, it is a challenge by a party not yet affected by the statute, based upon a contention that the statute will violate others' rights.  *See e.g. Broadrick*, 413 U.S. at 612 ("Litigants, therefore, are permitted to challenge a statute not because

---

[8]*Salerno*, 481 U.S. at 745 ("we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment").

their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression"); *see also Sabri v. U.S.*, 541 U.S. 600, 609 (2004) ("overbreadth challenges call for relaxing familiar requirements of standing, to allow a determination that the law would be unconstitutionally applied to different parties and different circumstances from those at hand").  Because facial challenges on overbreadth grounds are anticipatory, the Supreme Court discourages them, noting that they often require "premature interpretation of statutes on the basis of factually barebones records."  *Sabri*, 541 U.S. at 609 (internal punctuation omitted).

Logically, if a statute has <u>actually</u> been applied to a party, the need for an anticipatory and derivative facial challenge, based upon the same theories presented in the as-applied challenge, evaporates.[9]  In such situations, the court is presented with a concrete dispute by a party with actual standing and a fully-developed factual record.  In this circumstance, the more practical approach is to evaluate the constitutionality of the law in light of the concrete dispute, as a challenge to the application of the statute, rather than to speculate as to the merits of a hypothetical facial challenge.

In this case, the "pervasively sectarian" exclusion has actually been applied to CCU, and the Court can assess the constitutionality of the exclusion in the context of that application.  There is no value in independently assessing the constitutionality of the statute as it might apply to some other hypothetical college.  Indeed, CCU observes that the "pervasively sectarian" exclusion has

---

[9]Of course, a facial challenge to a portion of a statute that has yet to be applied to a plaintiff can be asserted simultaneously with an as-applied challenge to another portion of a statute.

been applied to another college, Naropa University, ¶ 13, yet CCU does not argue that the

"pervasively sectarian" exclusion unconstitutionally burdens Naropa University's Free Exercise

rights, nor the Free Exercise rights of any other college hypothetically subject to the exclusion.

Therefore, the Court declines to entertain any purported facial challenge to the statutes, and

instead focuses upon the issue of whether the statute was constitutional in the manner in which it

was actually applied to CCU.[10]   In doing so, the Court consolidates all arguments proffered by

CCU in support of its facial and as-applied Free Exercise challenges into a single, as-applied

challenge.

### 2.   Elements of the as-applied Free Exercise claim

The Free Exercise Clause of the First Amendment to the U.S. Constitution, applied to

Colorado by virtue of the Fourteenth Amendment, provides that Colorado "shall make no law . . .

prohibiting the free exercise" of religion.  U.S. Const., Am. 1, 14.   Given the multitude of ways in

which religion can be practiced and governments can legislate, it is of no surprise that Free

Exercise Clause jurisprudence is complex, unpredictable, and, at times, seemingly contradictory.

Here, the parties generally rely on three Supreme Court cases as setting out the elements of a Free

Exercise claim in this context:  *Employment Division v. Smith*, 494 U.S. 872 (1990); *Church of*

*the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993); and *Locke v. Davey*,

540 U.S. 712, 720 (2004).  Individually, none of these cases firmly set forth the elements that

---

[10]The elements recited by CCU as being applicable to its "facial" Free Exercise challenges, *see Docket* # 72 at 4-6, are repeated essentially verbatim as being the elements applicable to its "as-applied" Free Exercise challenge, *see Docket* # 72 at 32-33.  Thus, CCU can hardly claim to be prejudiced by the Court's decision to evaluate those elements only once.

apply to the type of Free Exercise claim asserted by CCU.  However, read together, they present a usable, sequential analytical framework.

*Smith* provides a starting point, directing the Court to assess whether the statute is neutral toward religious exercise.  In *Smith,* the Supreme Court emphasized that a neutral law can survive a Free Exercise challenge, even if the law compels conduct which an individual's religion prohibits, or prohibits conduct that is otherwise commanded by an individual's religion.  494 U.S. at 879.  With the exception of circumstances discussed more fully *infra* regarding "hybrid rights," a neutral statute that affects religious conduct is constitutional if it is justified by a rational connection to a legitimate governmental interest.  *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 649 (10th Cir. 2006).  However, if the statute is not neutral toward religion, it is presumptively unconstitutional and is subject to strict scrutiny; as such, it is constitutional only if it has been narrowly tailored to advance a compelling governmental interest. *Lukumi*, 508 U.S. at 533.

In *Locke v. Davey*, 540 U.S. 712, 720 (2004), however,  the Supreme Court rejected the categorical conclusion of *Lukumi* that non-neutral statutes are <u>always</u> presumptively unconstitutional.  In *Locke*, the Court considered a Washington statute that provided college scholarships to state residents, but prohibited the use of such scholarships to obtain degrees in theology. 540 U.S. at 716.  The plaintiff argued that, under *Lukumi*, the program was presumptively unconstitutional because it was not facially neutral with respect to religion. *Id.* at 720.  The Court apparently accepted the plaintiff's argument that the scholarship program was not neutral toward religion, but nevertheless rejected the conclusion that the statute was

presumptively unconstitutional because "to do otherwise would extend the *Lukumi* line of cases well beyond not only their facts but their reasoning." *Id.*

Unfortunately, the Court in *Locke* did not offer an alternative test or analytical structure to apply in cases involving non-neutral statutes, merely finding that "[i]n the present case, the State's disfavor of religion (if it can be called that) is of a far milder kind" than that of *Lukumi*. *Id.* The Court noted that, far from placing sanctions on religious behavior or requiring students to choose between religious beliefs and receiving a government benefit, "[t]he State has merely chosen not to fund a distinct category of instruction." *Id.* at 721. It is somewhat difficult to discern any clear governing principle from *Locke*, because the Supreme Court did not explain what circumstances compel a deviation from *Lukumi*'s presumption that non-neutral statutes are unconstitutional. However, given the factual similarity to the case at bar – both cases involve expressly religion-based exclusions from state higher education funding – this Court cannot simply distinguish *Locke* as inapplicable or presume that its holding was intended to be limited to its precise facts.

To the extent some guiding rule can be ascertained from *Locke*, it appears to be that non-neutral statutes that do not: (i) impose criminal nor civil sanctions on any religious service or rite; (ii) do not deprive religious observers of "the right to participate in the political affairs of the community"; (iii) do not "require students to choose between their religious beliefs and receiving a government benefit"; and (iv) simply reflect a governmental decision "not to fund a distinct category of instruction," are not presumptively unconstitutional, and thus are subject only to rational basis scrutiny. 540 U.S. at 720-21. Put more broadly, this Court understands *Locke* to instruct that where there is no manifest evidence that a challenged statute is motivated by hostility towards religious beliefs or practices, the presumption of unconstitutionality and need for strict

10

scrutiny under *Lukumi* yields to the more forgiving rational basis test.[11]   *Id.* at 725 ("In short, we find . . . [nothing] that suggests animus towards religion [and] therefore cannot conclude that the denial of funding for vocational religious instruction alone is inherently constitutionally suspect.").

### 3.  Applying *Locke*

Having discerned the analytical framework that could be applied, the Court now turns to the "pervasively sectarian" exclusion at issue here.  The Commission concedes that the exclusion is not neutral towards religion. Thus, the question becomes whether the exclusion is the type of non-neutral law that *Locke* nevertheless subjects to only rational basis scrutiny.

It is undisputed that the statutes denying financial aid to pervasively sectarian institutions do not impose criminal or civil sanctions upon any religious services or rites conducted by CCU, nor do the statutes deprive CCU or its students[12] of the right to participate in political affairs.

---

[11]Both sides here contend that an element of the claim requires CCU to show that its Free Exercise rights have been "substantially burdened." In support of this contention, the Commission cites *Locke*, 540 U.S. at 720, *Docket # 62* at 2, and CCU relies on *Smith*, but does not pinpoint cite the relevant portion of that case, *Docket # 72* at 5.  The term "substantially burdened" (or any of its material equivalents) does not appear anywhere in the majority opinion in *Locke*; at best, the notion appears only in summary dicta in the final paragraph of the Court's opinion, where it explains "The State's interest in not funding the pursuit of devotional degrees is substantial and the exclusion of such funding places a relatively minor burden on Promise Scholars." 540 U.S. at 725.  The phrase "substantially burden[ed]" <u>does</u> appear in *Smith*, however, but in the context of the Court discussing the balancing test of *Sherbert v. Verner*, 374 U.S. 398, 402-03 (1963). *Smith*, 494 U.S. at 883 ("Under the *Sherbert* test, governmental actions that substantially burden a religious practice must be justified by a compelling governmental interest"). In *Smith,* the Court explains that "[i]n recent years we have abstained from applying the *Sherbert* test (outside the unemployment compensation field) at all," 494 U.S. at 883, and implied that it was "[not] inclined to breathe into *Sherbert* some life beyond the unemployment compensation field."  *Id.* at 884. Thus, neither *Locke* nor *Smith* clearly stand for the proposition that a "substantial burden" on religious exercise is an element of an as-applied Free Exercise claim.

[12]CCU repeatedly argues that the "pervasively sectarian" exclusion infringes not only upon CCU's Free Exercise rights, but on the Free Exercise rights of CCU's students and prospective students as well.  Neither side specifically addresses whether, and to what extent, CCU has

Superficially, one could contend that the "pervasively sectarian" exclusion "require[s] students to choose between" exercising their religion by attending a religious university and receiving the governmental benefit of tuition assistance.  However, such an argument is foreclosed by *Locke*.   In a footnote explaining why the denial of scholarships to theology majors does not constitute "requir[ing] students to choose" between religious exercise and government benefits, the Supreme Court noted that scholarship recipients "may still use their scholarship to pursue a secular degree at a different institution."  540 U.S. at 721 n. 4.  When *Locke* speaks of compelling a choice between religious exercise and government benefit, it is clear from both its text and supporting citations that it is describing situations in which a student must completely forfeit one option in order to receive the other.  *Id.*, *citing, inter alia*, *Hobbie v. Unemployment Appeals Commission*, 480 U.S. 136 (1987) (requiring worker to violate religious objection to working on Sabbath in order to receive unemployment compensation "forced her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand") *and Thomas v. Review Board of Indiana*, 450 U.S. 707 (1981) (requiring worker to choose between violating religious objection to producing armaments or receiving unemployment compensation violated Free Exercise Clause).

That Colorado's financial aid programs limit, but do not completely preclude, the ability of students to seek religiously-informed higher education does not remove this case from *Locke*.

---

standing to challenge the tuition assistance programs on behalf of its students, and the Court has some doubt that such standing is as broad as CCU believes it to be.  Nevertheless, because it does not affect the analysis herein, the Court assumes that the standing of CCU and its students are consonant.

CCU cites to no facts that indicate that its students' religious beliefs <u>require</u> them to attend pervasively sectarian universities (or <u>prohibit</u> them from attending anything other than a pervasively sectarian one), such that they are faced with the choice of either adhering to their religious duty to attend a pervasively sectarian college or receiving the government benefit of tuition assistance.  Thus, the choices compelled by Colorado's statutes do not resemble the "all or nothing" choices faced by the parties in the cases cited in *Locke,* and thus, do not operate to remove this case from the *Locke* analysis.

Finally, to fall squarely within *Locke*, Colorado's statutes must reflect merely a choice "not to fund a distinct category of instruction."  540 U.S. at 721.  CCU argues that the statutes at issue here go beyond merely disqualifying a "category of instruction" from support, noting that students who attend CCU to pursue studies in <u>secular</u> professions are disqualified from tuition assistance as well, while students majoring in those same fields in public and generally sectarian institutions are not.  In *Locke*, the student sought to pursue a degree in theology, a field of study that the Supreme Court deemed "akin to a religious calling as well as an academic pursuit,"  540 U.S. at 721, and the Court emphasized that "the only interest at issue here is the State's in not funding the religious training of clergy."  540 U.S. at 722 n. 5.  Moreover, the Court in *Locke* observed that "[f]ar from evidencing [ ] hostility toward religion[,] . . . the entirety of the Promise Scholarship Program goes a long way toward including religion in its benefits."  540 U.S. at 724.  Notably, "the program permits students to attend pervasively religious schools, so long as they are accredited."  *Id.*

CCU is correct that the restrictive sweep of the Colorado tuition assistance scheme is broader than that of the scholarship program in *Locke*, but this distinction does not necessarily

warrant rejection of the *Locke* analysis.  CCU's contention that the bulk of its students major in secular subjects may be nominally accurate, but ignores what it means to be found to be a "pervasively sectarian" institution.

The Supreme Court first formulated the "pervasively sectarian" doctrine in *Hunt v. McNair*, 413 U.S. 734, 743 (1973), to describe "an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission or when it funds a specifically religious activity in an otherwise substantially secular setting."  In *Americans United for Separation of Church and State v. Colorado*, 648 P.2d 1072 (Colo. 1982), the Colorado Supreme Court characterized "pervasively sectarian" educational institutions as those "[w]here religious indoctrination is [ ] a substantial purpose," *id.* at 1080, those "whose educational function is not clearly separable from its religious mission," *id.* at 1081, and those "whose religious mission predominates over its secular educational role." *Id.* at 1082.  By contrast, it described sectarian schools whose students could constitutionally receive tuition assistance as those whose "secular function can readily be severed from its sectarian activity."  *Id.* at 1080. Thus, when an institution ostensibly offering secular education has nevertheless been deemed "pervasively sectarian," one may reasonably conclude that the religious mission of the institution is inextricably entwined with and predominates over such secular instruction.

Viewed in this light, CCU's designation as a pervasively sectarian institution suggests that a substantial portion of the "secular" instruction its students receive is inextricably entwined with religious indoctrination.[13]  In such circumstances, CCU's argument equating the "secular"

---

[13]This is not to say that <u>all</u> of CCU's secular instruction is laced with religious indoctrination.  Indeed, the notion that studies in fields such as accounting or economics can be inextricably entwined with and predominated over by religious content seems somewhat dubious.

14

education it offers and secular classes at public and generally sectarian schools such as Regis University or the University of Denver is misplaced, as the fact that those schools have <u>not</u> been found to be "pervasively sectarian" indicates that the secular character of instruction at those schools is readily severable from any religious teaching.  Even though there are classes or programs at CCU designed to prepare students for secular jobs or careers, because CCU is a "pervasively sectarian" institution, even its secular instruction is infused with religious components.[14]  Thus the unchallenged determination that CCU is "pervasively sectarian" makes even its secular instruction an "essentially religious endeavor," akin to the theological instruction in *Locke,* 540 U.S. at 721.

This Court is mindful that the scholarship program in *Locke* was available at even "pervasively religious" schools.  540 U.S. at 724.  In that respect, the facts of *Locke* are distinguishable from those in this case.  However, the Supreme Court addressed the significance of this aspect of the Washington scholarship program only in the context of an observation that the Washington scholarship program did not manifest such a "hostility toward religion" that

---

However, this criticism is one that essentially asserts that the six-factor "pervasively sectarian" test set forth in the statute is an arbitrary means of determining whether, in actual fact, a particular institution's instruction in a given subject area is predominantly religious or predominantly secular.  Such an argument is irrelevant to the claims presented here, which, as stated previously, do not include a Substantive Due Process challenge.

[14]Indeed, CCU stipulates that its President "informs incoming freshmen that 'Everything you learn at CCU will be framed within the Christian worldview, integrating your faith and your learning.'"  ¶ 16.  In an alumni publication, the President wrote that "Education at CCU . . . is simply more than students could hope to find in any secular setting, because there education here has been structured intentionally to foster their spiritual transformation."  ¶ 20.

application of the *Lukumi* test was appropriate.[15]  *Id.*  In that same sense, Colorado's tuition

assistance programs do not reflect any particular animus towards religious beliefs or practices.

Like the Promise Scholarship Program in *Locke*, Colorado also "goes a long way toward

including religion" within its reach.  540 U.S. at 724.  As all parties agree, the Colorado program

is structured in such a way that generally sectarian institutions such as Regis University and the

University of Denver are eligible to participate.  ¶ 82, 86.  Moreover, it is clear that students

wishing to study religion – at least to study religion from a secular perspective, free of

indoctrination – can receive tuition assistance to do so.  *See Americans United*, 648 P.2d at 1076

(noting that Regis University requires students to "take nine semester hours of religious study for

a bachelor's degree [although] this requirement may be satisfied by taking courses in the general

study of religion and culture, which includes courses in such religions as Hinduism, Buddhism,

and Taoism").  It is only when religious indoctrination predominates over secular instructional

value that the flow of aid is halted.  *Locke* expressly rejects the notion that funding some degree

of religiously-influenced study while refusing to fund another constitutes hostility towards religion

warranting strict scrutiny. 540 U.S. at 724-25.

Accordingly, based upon the application of *Locke*, the Commission is only required to

demonstrate that the exclusion of "pervasively sectarian" schools from tuition assistance is

rationally connected to a legitimate governmental interest.

---

[15]*Lukumi* involved a statute criminalizing animal sacrifices performed as part of "ritual or ceremony."  508 U.S. at 527.  The Supreme Court noted extensive evidence that the statutes were drafted with the sole purpose of suppressing the central element of worship services of the Santeria religion.  *Id.* at 534-42.  This overt hostility towards a specific religious practice stands in sharp contrast to the unspecific and remote burden on religious exercise that the scholarship program in *Locke* or the "pervasively sectarian" exclusion here represent.

4. <u>Applying the rational basis test</u>

The tuition assistance scheme easily passes such a test.  The Commission contends that Article IX, § 7 of the Colorado constitution provides the justification for the "pervasively sectarian" exclusion.  That provision states "Neither the general assembly, nor [other governmental bodies] shall ever make any appropriation, or pay from any public fund or moneys whatever, anything in aid of any church or sectarian society, or for any sectarian purpose, or to help support or sustain any . . . college [or] university . . . controlled by any church or sectarian denomination whatsoever."  In all material respects, this provision is essentially identical to the provisions of the Washington constitution addressed in *Locke*, which provided that "No public money or property shall be appropriate for or applied to any religious worship, exercise or instruction."  540 U.S. at 719 n. 2.  Addressing the Washington provision, the Supreme Court in *Locke* stated that "the interest it seeks to further is scarcely novel.  In fact, we can think of few areas in which a State's antiestablishment interests come more into play."  *Id.* at 722.  That same reasoning compels the conclusion here that Colorado's interest in vindicating Article IX, § 7 of the state constitution is a legitimate one.

Further, the Court finds that the statutory scheme is reasonably related to the furtherance of such interest.  By limiting aid to students attending pervasively sectarian schools, the statute directly carries out the dictates of Article IX, § 7.  The statute is narrowly drawn to apply not to every sectarian school, but only to those that are "pervasively" so, thereby allowing aid to flow to the maximum number of schools without compromising the core purposes of Article IX, § 7.  Indeed, CCU admits that more than 20 private colleges have been found eligible for tuition assistance, at least two of which – Regis University and University of Denver – reveal some

17

sectarian connection.  In contrast, only two colleges – including CCU – have been excluded as "pervasively sectarian."  ¶ 11, 13.   Accordingly, the Court finds that the challenged statutes meet the rational basis test.[16]

### 5. Hybrid rights theory

CCU argues that strict scrutiny should nevertheless be applied  under the "hybrid rights" doctrine, as recognized by the Supreme Court in *Smith*.  In *Smith*, the Court noted that its general rule – that laws that are neutral with respect to religion need only be justified under the rational basis test – could not account for apparently anomalous decisions concerning Free Exercise claims in which it had invalidated neutral, laws supported by a rational basis.  494 U.S. at 881, *citing, inter alia Cantwell v. Connecticut*, 310 U.S. 296, 304-07 (1940) *and Murdock v. Pennsylvania*, 319 U.S. 105 (1943).  It explained that, in those cases, the claims "involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press."  494 U.S. at 881-82.  The Court supposed that recognizing such multi-faceted constitutional claims brought its prior precedent into harmony, but, it did not expressly identify or validate any particular type of "hybrid" claim.[17]  Since then, courts have struggled to incorporate the *Smith* dicta into a coherent "hybrid rights" theory, and these efforts have been the subject much criticism.  *See generally Grace United,* 451 F.3d at 656 *and cases cited therein.*

---

[16]For reasons discussed *infra*, even assuming that the strict scrutiny test applied, the Court would nevertheless find that the statutes are narrowly tailored to achieve a compelling governmental interest.

[17]The Court found that "[t]he present case does not present such a hybrid situation."  494 U.S. at 882.

In its first attempt to elucidate a hybrid-rights doctrine, the 10th Circuit stated, also in dicta, that "[w]hatever the *Smith* hybrid-rights theory may ultimately mean, we believe that it at least requires a colorable showing of infringement of recognized and specific constitutional rights." *Swanson by and through Swanson v. Guthrie Independent School Dist.*, 135 F.3d 694, 700 (10th Cir. 1998). In *Swanson*, the Court appeared to assume, without necessarily finding, that if a plaintiff demonstrated a sufficient hybrid-rights claim, the challenged statute would be subjected to strict scrutiny, notwithstanding its neutrality. *Id.* at 699. In *Axson-Flynn v. Johnson,* 356 F.3d 1277, 1295 (10th Cir. 2004), the 10th Circuit clarified that the "colorable" showing required in *Swanson* demanded a plaintiff show "a fair probability, or a likelihood of success on the companion claim." *Id.* There continues to be some doubt, at least in this circuit, as to the vitality of the hybrid-rights theory. The 10th Circuit has never expressly recognized a claim founded solely on a hybrid rights argument. Indeed, in the two most recent instances in which it has addressed the hybrid rights doctrine, the criticisms of the doctrine occupy almost as much space as its explanation. *Axson-Flynn*, 356 F.3d at 1296 & n. 18 ("the hybrid-rights theory has been roundly criticized from every quarter"); *Grace United*, 451 F.3d at 656 & n. 2 ("The hybrid rights doctrine is controversial. It has been characterized as mere dicta not binding on lower courts, criticized as illogical, and dismissed as untenable.") (citations omitted).

This Court need not decide the larger question of whether the hybrid rights doctrine generally applies. Even if the hybrid rights doctrine were recognized in this circuit as a free standing claim, in this case CCU has not made a colorable showing that any other constitutional right has been infringed. CCU's arguments in support of a hybrid rights claim are unfocused and

undeveloped. The arguments are simply a collection of premises, case citations, and conclusions,[18]

that fail to rise to the level of a "colorable showing" that the "pervasively sectarian" exclusion

infringes upon some other constitutional right of CCU.  There is no clear identification of facts or

legal argument as to how the "pervasively sectarian" exclusion burdens CCU's free speech rights;

only a perfunctory argument that the exclusion burdens CCU's associational rights, based on

averments of fact that are neither cited to nor apparent anywhere in the record[19]; and the

argument that the exclusion burdens CCU's (or, more accurately, its students') fundamental right

to an education has no supporting facts or useful legal analysis.  Furthermore, CCU fails to

articulate the elements necessary to show an infringement of any of these independent

constitutional rights, much less offer any significant argument as to how the tuition assistance

programs violate them.  Instead, CCU relies upon conclusory assertions and case citations, the

---

[18]CCU's entire hybrid rights discussion appears at pages 11-12 of its motion.  That
discussion consists of two paragraphs.  The first paragraph: (i) asserts, without citation, that
"CCU educates students in an academic environment that incorporates religious association and
speech"; (ii) quotes *Smith*, which itself quotes *Roberts v. United States Jaycees*, 468 U.S. 609,
622 (1984), to the effect that a burden on an associative right can also intrude on other First
Amendment protections; (iii) asserts that strict scrutiny should be applied to claims that involve
both freedom of expressive association and the free exercise of religion; and (iv) flatly asserts,
without further explanation, that "[t]he instant dispute is just such a case."  The second paragraph
asserts the premise that Colorado's statutes "burden[ ] the right of Plaintiff's students to pursue
the education of their choice," cites generally to several Supreme Court cases, and contends that
certain facts not found in the record, *see* n. 19, *infra*, "raise at least a 'colorable infringement' of
its rights of religious expression, education and association." *Docket* #72 at 11-12.

[19] CCU argues that "Colorado's requirement that CCU open its board membership and
faculty positions to persons who do not share the school's religious beliefs, and that it abandon its
practice of regular chapel attendance . . . raise at least a 'colorable infringement' of its rights of
religious expression, education and association." *Docket* #72 at 12.  CCU does not cite to the
stipulated facts nor any other evidence for the proposition that the Commission "require[d]" it to
"open its board membership" and "abandon its practice of regular chapel attendance."

applicability of which is never explained. As a consequence, the Court finds that CCU has failed

to make a sufficient showing to invoke the hybrid rights theory.

      6.  <u>Constitutionality of the "pervasively sectarian" definition</u>

The final set of arguments by CCU in support of its Free Exercise claim is the contention

that Colorado's "statutory definition of 'pervasively sectarian,'," violates the Free Exercise clause.

*Docket* # 72 at 24.  The precise focus of this argument is unclear.  On the surface, it appears that

this challenge contends that the six statutory factors in C.R.S. § 23-3.3-101(3)(d) – that is, the

factors that the Commission weighs to determine whether an institution is "pervasively sectarian"

– violate CCU's Free Exercise rights.  Conceptually, it is difficult to understand how a statutory

definition can violate someone's First Amendment rights.  A definitional statute requires no

action; it merely explains how the Commission is to interpret the phrase "pervasively sectarian."

An alleged deprivation occurs only when an institution, having been found to be "pervasively

sectarian," is thereafter excluded from participation in the tuition assistance programs.[20]   The

Court is further confused by the substantive argument offered CCU in support of this "claim."  It

appears to mix arguments about associational rights from the hybrid rights doctrine arguments,[21]

an argument that appears to be based on an allegation of vagueness,[22] and an argument as to the

---

    [20]Perhaps CCU's actual argument is that the six statutory factors are an arbitrary and capricious means for making the determination as to whether an institution's secular instruction is imbued with religious indoctrination.   Such an argument sounds in the nature of Substantive Due Process.  As previously stated in n. 13, CCU did not plead a Substantive Due Process claim  in the Amended Complaint, nor has it adequately stated the relevant elements and applicable law governing Substantive Due Process challenges in its motion.

    [21]*See Docket* # 72 at 24-25.

    [22] *Id.* at 26.

continued vitality of the Supreme Court's "pervasively sectarian" standard,[23] with an attempt to distinguish *Locke* on its facts.[24]

Given that all the parties are ably represented by experienced counsel in this matter – indeed, CCU's motion is signed by 9 separate attorneys –  the Court will not attempt to reinterpret or refashion arguments that are not well-developed or well-presented.  Moreover, the Court has previously rejected two prior versions of CCU's motion, *see Docket* # 60, 71, as being insufficiently focused and formatted, and thus, the Court assumes that the current version of motion represents CCU's most concerted effort to present its claims in as clear and precise language as is possible.  Because this portion of CCU's brief does not present a complete and coherent argument as to how a definitional portion of a statute can itself violate a party's Free Exercise rights, the Court declines to separately address each of the various issues that CCU's has spotted, but not completely developed in argument in this portion of its motion.

The only portion of CCU's argument in this area that is susceptible to meaningful analysis is its contention that the Supreme Court has repudiated the "pervasively sectarian" standard.  The phrase "pervasively sectarian" first appeared in Supreme Court jurisprudence in *Hunt*, 413 U.S. at 743, an Establishment Clause challenge to state aid for construction projects at public and private colleges.  In rejecting the argument that the aid lacked a secular purpose when allowed to flow to church-owned private colleges, the Supreme Court observed that it "has not accepted the recurrent argument that all aid is forbidden because aid to one aspect of an institution frees it to

---

[23]*Id.* at 27-28.

[24]*Id.* at 39-31.  The Court has already considered the arguments relating to *Locke* in the course of the preceding analysis.

spend its resources on religious ends." *Id.*  Offering a contrasting hypothetical situation where

such aid might not be proper, it added "[a]id normally may be thought to have a primary effect of

advancing religion when it flows to an institution in which religion is so pervasive that a

substantial portion of its functions are subsumed in the religious mission or when it funds a

specifically religious activity in an otherwise substantially secular setting." *Id.*  In *Roemer v.*

*Board of Public Works of Maryland*, 426 U.S. 736, 755 (1976), an Establishment Clause

challenge to a program of state aid to public and private colleges, the dicta of *Hunt* blossomed

into a clear rule: "*Hunt* requires (1) that no state aid at all go to institutions that are so

'pervasively sectarian' that secular activities cannot be separated from sectarian ones, and (2) that

if secular activities can be separated out, they alone may be funded." *Id.*

 The scope of "pervasively sectarian" as articulated in *Roemer* appeared to begin to narrow

in *Witters v. Washington Department of Services for the Blind*, 474 U.S. 481, 488 (1986).  In

*Witters*, a blind student was refused state aid for vocational education on the grounds that he was

attending a bible college, studying to be a pastor, and that awarding such aid would be tantamount

to funding religious instruction in violation of the Establishment Clause.  The Supreme Court

rejected any argument that withholding the aid was necessary to avoid violating the Establishment

Clause, noting that because the aid was payable to the student, rather than the institution, the

student's free choice in deciding where to attend school and what to study insulated the state

against any undue religious entanglement.  *Id.* at 481.

 The eventual abrogation of the "pervasively sectarian" exclusion was previewed in Justice

Thomas' dissent to a denial of certiorari in *Columbia Union College v. Clarke*, 527 U.S. 1013

(1989).  In *Columbia Union*, the Fourth Circuit had invalidated a state aid program that included

private colleges, finding that *Roemer* required the exclusion of aid to "pervasively sectarian"

institutions, and rejecting the plaintiff's argument that recent Supreme Court caselaw had relaxed

the "pervasively sectarian" exclusion such that it no longer had vitality. *Columbia Union College*

*v. Clarke*, 159 F.3d 151, 157-60 (4th Cir. 1988).  The Fourth Circuit acknowledged that Supreme

Court cases such as *Witters* "unquestionably undermine the *Roemer* dicta that no state aid at all is

permissible to a pervasively sectarian institution," but found that *Roemer* still applied with regard

to grants of state aid that were payable directly by the state to such institutions.  *Id.* at 159.

Although the Supreme Court denied certiorari to hear an appeal of the Fourth Circuit's ruling,

Justice Thomas dissented from that denial, remarking that the "pervasively sectarian" exclusion

commanded by *Roemer* rested on, among other things, an assumption – that government funds

can never be used to benefit, directly or indirectly, a religious institution – that had since been

refuted by cases like *Witters*.  527 U.S. at 1013.  Further, Justice Thomas noted that the

"pervasively sectarian" exclusion "directly collides with our decisions that have prohibited

governments from discriminating in the distribution of public benefits based upon religious status

or sincerity."  *Id. citing, inter alia, Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515

U.S. 819 (1995).  He urged that "[w]e should take this opportunity to scrap the "pervasively

sectarian" test and reaffirm that the Constitution requires, at a minimum, <u>neutrality</u> not <u>hostility</u>

towards religion." *Id.* (emphasis in original).

Justice Thomas' recommendation bore fruit a year later in *Mitchell v. Helms*, 530 U.S.

793 (2000).  There, the Court turned back an Establishment Clause challenge to a state program

that lent educational materials and equipment to public and private schools for secular programs.

The District Court found that the program improperly provided direct aid to "pervasively

sectarian" schools, but writing for a plurality of the Court, Justice Thomas reversed, finding that the program's neutral criteria benefitted "the religious, irrelegious, and areligious alike," *id.* at 809, and that indirect aid flowing to an institution as a result of the private choice of the recipient refutes any argument alleging governmental entanglement in religious instruction. *Id.* at 810. The plurality expressly rejected the notion that whether aid flowed to schools that were "pervasively sectarian" or not was a factor bearing on the constitutionality of the program. "[T]here was a period when this factor mattered," Justice Thomas wrote, "[b]ut that period is one that the Court should regret and is thankfully long past." *Id.* at 826. Justice Thomas observed, among other things, that the "pervasively sectarian" analysis' relevance "is in sharp decline," *id.*, and that the religiousness of a recipient should not matter so long as the government's secular purpose is being met by the aid, *id.* at 827. Concluding, Justice Thomas wrote that "nothing in the Establishment Clause requires the exclusion of pervasively sectarian schools from otherwise permissible aid programs, and other doctrines of this Court bar it." *Id.* at 829.

From the foregoing, several matters are evident. First, and most importantly, it is unclear how CCU's criticism of the "pervasively sectarian" test or suggestion of its demise via *Mitchell* has any relevance to CCU's <u>Free Exercise</u> claim. Every single case cited above involves challenges brought solely under the Establishment Clause. But for two brief quotations from *Mitchell* in its Establishment Clause arguments, CCU has chosen to present its arguments regarding *Mitchell* within the portion of its motion concerning the Free Exercise claim. Thus, the Court assumes that CCU intends to argue that *Mitchell* has some bearing on its Free Exercise claim. Based on the Court's review of *Mitchell* and its predecessors, the Court finds no application.

Second, even assuming that these cases were somehow relevant to a Free Exercise claim, the fact that the Supreme Court has repudiated the "pervasively sectarian" analysis as a component of the analysis of the Establishment Clause of the U.S. Constitution is irrelevant here. In the context presented here, the "pervasively sectarian" exclusion is not a judicial tool used to analyze whether a government program violates the Establishment Clause, but is instead, a statutory implementing Article IX, § 7 of the Colorado constitution.  This provision in the Colorado constitution is far more restrictive than the First Amendment analogue in the U.S. Constitution.  Federal courts may have abandoned the "pervasively sectarian" analysis for purposes of the Establishment Clause of the U.S. Constitution, but Colorado's courts have not announced a similar rejection of the analysis as it relates to Art. IX, § 7 of the Colorado constitution.  Thus, it appears that the "pervasively sectarian" exclusion remains a viable means of applying Article IX, § 7, notwithstanding *Mitchell*.

Finally, at least in the Free Exercise context, CCU's argument that the "pervasively sectarian" exclusion has been rendered not only irrelevant, but actually illegal[25] appears to be inconsistent with the Supreme Court's ruling in *Locke* that a state may validly differentiate between varying levels of religious influence in education.

Accordingly, the Court finds that the Colorado tuition assistance program does not violate CCU's Free Exercise rights under the United States Constitution, and the Commission is entitled to judgment on CCU's Free Exercise claims.

**B.  Establishment Clause claims**

---

[25] S*ee Mitchell*, 530 U.S. at 829 (suggesting that "other doctrines of this court bar" the "pervasively sectarian" exclusion)

As applied to the states through the Fourteenth Amendment, the First Amendment to the U.S. Constitution directs that Colorado "shall make no law respecting an establishment of religion." The classic Establishment Clause analysis derives from *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971). For a statute to be constitutional, there must be proof of three elements: (i) that the statute has a secular legislative purpose; (ii) that its primary effect neither advances nor inhibits religion; and (iii) that it does not foster an excessive governmental entanglement with religion. In cases involving aid to schools, the Supreme Court has modified the *Lemon* analysis to combine the second and third elements, as the same considerations underlie both elements. *Mitchell*, 530 U.S. at 807-08. Thus, the "entanglement inquiry [is] simply one criterion relevant to determining a statute's effect." *Id.*

Both parties here agree that the first element of the *Lemon* test – that the statute have a secular purpose – is satisfied, and thus, the sole question to be considered here is whether the tuition assistance programs in Colorado have the primary effect of advancing or inhibiting religion. *Mitchell* teaches that the inquiries to be made with regard to this element are: (i) whether it results in governmental indoctrination; (ii) whether it defines its recipients with reference to religion; and (iii) whether it creates excessive entanglement. 530 U.S. at 808.

Attempting to consider the first question – whether the tuition assistance programs amount to governmental indoctrination – reveals difficulty in applying the *Mitchell* framework to the facts of this case. In the typical Establishment Clause case, the government is accused of <u>advancing</u> the objectives or teachings of religious entities by allowing them some benefit. *See e.g. Mitchell*, *supra.*, *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002). In such circumstances, an inquiry into whether the governmental action has the primary effect of religious indoctrination is

27

eminently sensible. The Establishment Clause issue presented in this case does not neatly fit this paradigm: the question is not whether the Establishment Clause <u>compels</u> Colorado to exclude pervasively sectarian colleges from tuition assistance, but whether the decision to voluntarily do so – while allowing aid to other sectarian colleges – violates the Establishment Clause.

The Establishment Clause prohibits discrimination in favor of one religious denomination over another. *Larson v. Valente*, 456 U.S. 228, 246 (1982).  In this regard, *Larson* presents the closest analytical analogue for addressing CCU's Establishment Clause claim.  In *Larson*, the state of Minnesota amended its registration and reporting requirements for charities engaging in monetary solicitation by partially revoking a blanket exemption for religious organizations.  Under the new scheme, religious organizations that received more than half of their total contributions from members or affiliated organizations were required to comply with the registration and reporting requirements.  The Supreme Court found that the new rule impermissibly distinguished between "well-established churches" on the one hand, and "churches which are new and lacking in a constituency" on the other, or between churches who, as a matter of policy or doctrine, favor public solicitation over general reliance on financial support from members.  *Id.* at 246 n. 23. Explaining that the *Lemon* test was intended to apply to "laws affording a uniform benefit to <u>all</u> religions, and not to provisions . . . that discriminate <u>among</u> religions," *id.* at 252 (footnote omitted), the Court instead analyzed the constitutionality of the statute by simply applying the strict scrutiny test, requiring that the statutory classification be justified by a compelling governmental interest and be closely fitted to further that interest.  *Id.* at 247.   Colorado's tuition assistance programs similarly differentiate among sectarian institutions.  It gives tuition assistance to those which segregate religious indoctrination from secular education, and denies assistance to

28

those which, by policy or doctrine, freely mix the two.  In such situations, *Larson* directs that the Court analyze CCU's Establishment Clause claim by applying the strict scrutiny test.

Colorado's antiestablishment interest in avoiding governmental aid for religious instruction, as mandated by Article IX, § 7 of the Colorado constitution, is a compelling one. *Locke*, 540 U.S. at 722; *see also Widmar v. Vincent*, 454 U.S. 263, 271 (1981) ("We agree that the interest of the University in complying with its constitutional obligations may be characterized as compelling").  CCU argues that the "pervasively sectarian" exclusion does not operate to achieve the state's antiestablishment interest because in cases such as *Americans United,* the Colorado Supreme Court has already determined that the student aid programs do <u>not</u> violate the state constitution when allowed to flow to sectarian schools.  This argument misreads *Americans United*.  In *Americans United*, the Colorado Supreme Court rejected the argument that allowing tuition assistance to flow to students at Regis University, a sectarian institution, but one which is not "pervasively" so, violated the Establishment clause of the U.S. Constitution because, among other things, the existence of the "pervasively sectarian" exclusion "obviates any real possibility" of undue governmental entanglement with religion.  648 P.2d at 1077-78, 1081.  Contrary to CCU's contention, *Americans United* does <u>not</u> stand for the proposition that extending aid to "pervasively sectarian" institutions would similarly pass constitutional muster.  To the contrary, *Americans United* expressly depends upon the "pervasively sectarian" exclusion as the bulwark which ensures that tuition assistance will not inure to sectarian purposes.  *Id.* at 1081.  Accordingly, the Court concludes that the "pervasively sectarian" exclusion operates to advance a compelling governmental interest.

To survive strict scrutiny, a statute must not only advance a compelling governmental interest, but it must also be narrowly tailored.  A statute is narrowly tailored if it targets and eliminates no more than the exact source of the evil it seeks to remedy.  *Frisby v. Schultz*, 487 U.S. 474, 485 (1988).  Colorado's tuition assistance programs do not exclude all sectarian institutions, only those in which  religion intrudes upon secular instruction.  In limiting the exclusion to pervasively sectarian institutions, Colorado ensures that the exclusion only affects situations where its antiestablishment interests are the most pronounced  – that is, those whose purportedly "secular" instruction is predominated over and inextricably entwined with religious indoctrination.  Thus, the exclusion operates to affect only those institutions whose financial assistance would otherwise contravene Art. IX, § 7, and the Commission has carried its burden of showing that the exclusion is narrowly tailored.

CCU offers two arguments[26] to refute the Commission's showing that the exclusion is narrowly tailored.  First, it contends that the state "could have [instead] excluded courses in theology or Biblical studies from eligibility for funding credits."  This argument again misunderstands what it means for an institution to be deemed "pervasively sectarian."  The Court must accept, as a matter of fact, that CCU is a "pervasively sectarian" institution and therefore that CCU's "religious mission predominates over its secular educational role." 648 P.2d at 1082. As a result, it is not just CCU's "courses in theology or Biblical studies" that raise the risk of

---

[26]To the extent CCU's intends its expressions of dissatisfaction with the statutory factors by which the Commission determines whether an institution is "pervasively sectarian" or the manner in which the Commission applied those factors in this case to be interpreted by the Court as an argument that the "pervasively sectarian" exclusion is not narrowly tailored, such an argument is little more than a recharacterization of the Substantive Due Process claim that CCU has chosen not to expressly plead here, and the Court rejects it for that reason.

public funding of religious indoctrination; by definition, religion influences and predominates over CCU's secular instruction as well.[27]  It is not simply a question of excluding Biblical studies or theology from funding – indeed, students at generally sectarian colleges can receive tuition assistance for such studies, *Americans United*, 648 P.2d at 1076 – but rather, a question of excluding funding for all religious indoctrination, whether it be found in a theology lecture or in an accounting course.

Second, CCU argues that Colorado permits the expenditure of public money on pervasively sectarian institutions in other respects.   The fact that Colorado does not consider other types of aid to religious institutions to violate Article IX, § 7 of its constitution is irrelevant to the question of whether the "pervasively sectarian" exclusion is necessary to ensure that the tuition assistance at issue here complies with that provision.  Putting aside any other potentially distinguishing characteristics between the tuition assistance programs here and the statutes cited by CCU, CCU does not show that these statutes have survived or necessarily would survive a challenge under Art. IX, § 7 of the Colorado constitution.   The fact that the Colorado Supreme Court in *Americans United* has already relied upon the "pervasively sectarian" exclusion as saving the tuition assistance programs at issue here from potential unconstitutionality militates strongly

---

[27]One could argue – although CCU does not specifically do so – that the state could attempt to examine, course-by-course, every class offered by CCU to compile a list of those that, by virtue of subject matter, curriculum, and/or instructor, are free of undue religious influence, and proceed to offer tuition assistance only as to those courses.  Even assuming this alternative were practical from an administrative standpoint, it fails to account for other systemic practices at CCU that undermine any suggestion that its students can receive a secular education free from religious indoctrination.  For example, CCU admits that it requires all of its undergraduate students to attend 25 of the 30 semiweekly chapel services each semester. ¶ 37.  Presumably, this policy applies equally to students at CCU who are otherwise interested only in secular courses of study.

against comparing the statutes at issue here with those whose constitutionality has yet to be evaluated.

Accordingly, because the evidence demonstrates that the "pervasively sectarian" exclusion is narrowly tailored to accomplish the state's compelling interest in complying with the antiestablishment directives of its own constitution, the Commission is entitled to judgment on CCU's Establishment Clause claim.

### C. Equal Protection

In many ways, CCU's Equal Protection claim resembles its Establishment Clause claim, insofar as CCU acknowledges that the relevant Equal Protection analysis first examines whether the statutes differentiate between religions for purposes of awarding tuition assistance, and that if such discrimination occurs, that the Commission must show that the statutes survive strict scrutiny. Accordingly, the preceding Establishment Clause analysis applies with equal force to CCU's Equal Protection claim.  For the reasons previously articulated, the Commission is entitled to judgment on CCU's Equal Protection claim.[28]

**CONCLUSION**

For the foregoing reasons, the September 20, 2006 Minutes (**# 71**) are deemed

**AMENDED** to reflect the prior denial of the Plaintiff's Motion for Summary Judgment (**# 62**) was without prejudice.  The Commission's Motion for Leave to Submit Supplemental Authority (**# 76**) is **GRANTED**. The Motions for Summary Judgment (**# 64**) and (**#72**) are **GRANTED**,

---

[28]Although not strictly necessary to the Court's conclusion on the Equal Protection claim, the Court observes that CCU's Equal Protection arguments spring from CCU's assumption that CCU is "similarly situated" to Regis University and the University of Denver.  Of course, it is undisputed that neither Regis University nor the University of Denver was found by the Commission to be "pervasively sectarian." Thus, they are not "similarly situated" to CCU at all.

insofar as the Court finds that no trial is required.  The Defendants' Motion for Summary

Judgment is further **GRANTED**, and the Plaintiff's Motion for Summary Judgment is **DENIED**,

to the extent that, based upon the stipulated facts, the Commission is entitled to judgment in its

favor on all claims.

Dated this 18th day of May, 2007

**BY THE COURT:**

Marcia S. Krieger
United States District Judge